Oyez! Oyez! Oyez! All present in the manner of formal business before the Honorable United States Court of Appeals for the Fourth Circuit, I must withdraw now and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Brignac You may proceed. Thank you, Chief Judge Gregory. May it please the Court, Eric Brignac for Chris Tucker. The District Court erroneously concluded that clear and convincing evidence supported involuntarily medicating Mr. Tucker. First, clearly erred in concluding that the forced medication would be substantially likely to restore Mr. Tucker to competency. Second, it legally erred when it weighed the government's interest at stake. And additionally, the Court erred in simply extending Mr. Tucker's confinement for the involuntary medication, which was outside of the scope of that which was authorized by Section 4241D. We'll start with the substantial likelihood prong. The District Court relied heavily on two things in order to conclude that the medication, the forced medication would be substantially likely to render Mr. Tucker competent. It relied heavily on Dr. Grady's testimony, and it relied heavily on the report by Dr. Stribling-Riley that said that Mr. Tucker had been restored to competency. Both these are clearly erroneous because they both go back to that erroneous report by Dr. Stribling-Riley. If the Court looks to an Appendix 1282, that report they were talking about, Mr. Brignac, where is all this headed? What do you want to happen at the end of the line? If you say, well, you can't voluntarily medicate, what would you have the government do? Do you want the government to just release Mr. Tucker outright? Or do you want him to go to trial, which he's not really competent to render assistance to his counsel or maybe to understand what's going on? So what's the end point here? Where does all this end? What is it exactly that you want the government to do? I think there are two things that the government could do if this Court rules in our favor, and there's one that I certainly would prefer. The Court should order Mr. Tucker released, physically released. Not dismiss the indictment, though I do think it's a practical matter because he can't be made competent. That would be the practical endgame. But I think there's no statutory authority to detain him. Now at the end of Section 4241D, it does indicate that once this is over and if there is no substantial likelihood of restoration, the defendant is subject to 4246 or 4248 proceedings. And we've already gotten a preview. If the government is simply releasing him, doesn't the government have an interest in protecting child victims? And wouldn't an outright release place that interest in jeopardy? Your Honor, the idea that the government can detain someone if it believes he's a danger, that's well outside of due process. There are statutory mechanisms for that. There's 4246 and there's 4248. Mr. Tucker would have to go through all of those proceedings. Now we've gotten a preview of coming attractions. The doctors at Butner have indicated that they do not think that Mr. Tucker is actually dangerous, so he would not be committable under 4246 or 4248. But certainly Congress did not intend for 4241 to be extended indefinitely. It created a mechanism for that to address exactly Your Honor's concerns. Now, Mr. Tucker, when Dr. Stripling Riley wrote her report, he had been on dissolvable olazapine for five months. That's a Joint Appendix 1282. He'd been on from October 2019 at least to February 2022. And that was at 25 or 30 milligrams. And they did do a blood draw and they said that there were therapeutic levels of the medicine in his blood. So that's the remedy that the government says will restore him to competency. Now, in that very report, with five months of the medicine in his blood at therapeutic levels, he was still talking about the fact that the prison law library had been hacked. That is not someone, Your Honor, who can substantially, I'm sorry, using the wrong word, that is not someone who can assist his attorneys. That is someone who is still suffering from those delusions. And I think that gets to the key of what's going on here. Because there are two ways in our law under Dusky and under 4241D that an individual can be incompetent. They can simply have no idea of what's going on or they can be unable to assist their attorneys. And we're all on prong two here because of his delusions. At no point have those delusions gone away. And the only reason that Dr. Stripling Riley concluded that he was competent to assist his attorneys was because she did a report where she didn't talk to his attorneys. She didn't review any jail calls. She didn't talk to anyone in his family. She didn't do any of that. She didn't do any of the things to get to the delusions. And in fact, in the one conversation she seemed to have with him, he's talking about the fact that the law library's hacked. I don't want to rely too much on my own experience as a defense attorney. But a client cannot assist you if you're putting things in front of them and he's saying those aren't the right words. Somebody must have hacked something. And even the prior... So I think this case is really hard in a lot of ways. And I'll just give you one factual question that I'm trying to get my hands around. So one of the issues is whether or not your client ever fully complied with the medication regimen for a period of time. And they say he didn't and you say he did. But I have a very straightforward factual question. What three to four month period, like what months in time is it your claim that your client was fully complying with the medication regimen? There is one year honor where he was fully compliant and one year honor where he was almost fully compliant. Number one, and I don't think, and I very much apologize for this, I don't think this was put in our briefs or clear in our briefs. So it is very much in the record. October 2019 to February 2020. Because he was on the dissolvable elazapine. And all the evidence in the record says that you can't cheek that, you can't hide it, put it on your tongue, it dissolves. And if you look in Joint Appendix 893, that's Dr. Grady saying he was on the dissolvable medication. Joint Appendix 657, Dr. Kunick's testimony in September 2020 was saying he was compliant. So that was dissolvable. And that was five months, October through February 22, with 25 to 30 milligrams. So again, the higher dose that they said. Your Honor, I would also say, and again, not 100% compliance, but 100 to the 90s. And let me see, you're right, this is a complicated case. I have a lot of notes. November, December 2018 through January 2019, he's at 100%, 97%, 84%. But I also want to get to your honors, a deeper question there, which is part of the reason the government is saying, oh, you know, he wasn't compliant. He was so close, if only he'd fully taken the medicine. Is it's taking this evidence from the blood draws. And Joint Appendix 342, Dr. Grady admits, you know, we weren't actually as diligent as we should have been about the blood draws. He says, I take responsibility for that. Mr. Tucker looked like he was close. I wasn't doing my job properly. Joint Appendix 341, and again, I don't think this ended up in the briefs and I'm kicking myself. But Joint Appendix 341, Dr. Grady's testimony, they're saying they gave him the wrong pills for a little while. He was supposed to be getting the elazapine. They messed up his pills. So if you then do a blood, you give someone the wrong medicine, you do a blood draw and say he's not compliant. And by your own admission, you're not doing the blood draws properly. And as the government, you have the burden of proof by clear and convincing evidence. And you're trying to say, well, we don't think Mr. Tucker was compliant. You know, I don't, I think it's clearly erroneous to say the government has met that burden of proof. Well, I was just trying to figure out how does that cut, though? Because, I mean, as I understand your argument on the cell prong, not on the delay prong, but on the cell issue, is there's the line that you quote in your brief, and it's a good line. You can't keep trying over and over and over again and failing and then assisting that at some point it's going to work. Now, their response to that is we've never actually tried the thing the district court ordered here because the thing the district court ordered here has never actually been tried before. Because I do take your point. If at some point you try and try and try and it never works, then it's not going to work. But so I guess if you're telling me that there were things that were done wrong with it previously, I'm not really sure how that cuts for the cell analysis. Because on the one hand, it means the government had a chance. And at some point they can't keep trying again and again and again. But on the other hand, it undercuts your claim. One of the claims you make in your brief is we know this isn't going to work because it hasn't worked in the past. And their response to that is, well, we haven't actually tried this in the past. So what do I do with that? Exactly, Your Honor. So first, I think one thing Your Honor can do, if you don't want to go into that mayor's nest, is look at the October 19th to February 2020. Because that was five months dissolvable elazapine. And he's still talking about the prison law library being hacked. So you can just, I think, start there and stop there. But I also think this gets to where, and I very much, and believe me, I've thought about Your Honor's point that, you know, hey, the medicine wasn't ever given to him properly. I'm not sure, even if it was the government's fault, don't we still have a factual problem that he never got the medicine? And that's where I think you have to remember that this isn't a, I have an infection and I go into the doctor and he's trying different antibiotics and I'm voluntarily going to him and the like. This is a human being who is being detained without any criminal conviction whatsoever. And due process requires the government to have some basic standard of care. And they have the burden of proof. And if the government comes back and says, well, Your Honor, he wasn't fully compliant. You know, the numbers, I mean, we look at the district court's first order and you see these four to three, four month periods with almost 100% compliance. Government counters, says, no, no, Your Honor. Counselor, you're up against a specific finding that the district court made and it's subject to clearly erroneous review that there was a past record of improvement when the appellant here was more compliant. And I don't know how we, he found Dr. Gaveley or whatever to be a highly credible witness. And he made the correct finding under the correct standing. He says involuntary medication is quote, substantially likely to restore competency. And on the cell, that's exactly what he's supposed to do to make exactly that inquiry. He made exactly that inquiry. He made several specific findings about the credibility of the witness and about the potential of the treatment when there was compliance.  It is, it is, Your Honor, but we overcome it here. I think he's relied on improper evidence, which I'll explain in a second. And I think there is a firm and definite conviction that a mistake has been committed. He relied on Dr. Grady. Dr. Grady relied on the Dr. Stribling-Riley report, which the government admits was effectively withdrawn. And Dr. Grady himself says, you know, it was all old records. Joint Appendix 1392, we didn't talk to Mr. Tucker. Nothing but cold records, which all predate Dr. Koenig's testimony. It was stale. It was improper. I also, Your Honor, want to get to, again, this dilute, this inability to assist counsel. This is the first prior to the first cell order. Joint Appendix 1139, Dr. Stribling-Riley's report, November 2018. She says the olazapine and the fluoxetine helped, but not with his delusions. Quote, suspiciousness regarding others remain. He continued to believe the government planted evidence on him. There was a specific conspiracy against him involving the FBI. Joint Appendix 1168, her second report, May 2019. She says he can't, quote, cooperate rationally with counsel. And again, at least in terms of the first report, she's saying that he was compliant with the medication. And she's getting that from the Bureau of Prisons Records. And the government wants to come in and say, well, actually, we don't think those records were good because he was cheeking and our blood draws show this, that, and the other. But the reason that counter doesn't work is because the government itself admits we weren't doing the blood draws properly. So to say we're not taking your blood properly, we're not doing this properly, but that should be enough to undercut the Bureau of Prisons Records, it's not enough. And just as I'm here on clear error, the government in the district court was on clear and convincing evidence. I have a couple of questions about the duration issue, not the cell issue. So I just have a factual question to start with. All of these arguments about how long he's been detained, it seems to me obviously were available during the previous appeal. Is that not right? I think, yes. And none of them were made? We did not. Well, not in the appeal, Your Honor. We did in the district court. As soon as the government moved for that third period of restoration, if the statute says you get four months, then you get another period, then the government moved for that. Well, but what about the district court's conclusion that there was something, I will confess I find this waiver issue really hard too, because I agree there was at one point an objection that you say he's been objecting for three years and I think you have that date in 2019 or 2020 where he starts objecting. But then there's stuff after that that looks a lot like acquiescence, right? I'm thinking of September 23, 2020 and February 23, 2021. And I look at the transcripts and I do not see defense counsel saying he's being held illegally. And so I guess there seems like a lot of waiver issues here and I don't know what to do with those either. So would you like to address that? Yes, I would. Thank you very much, Your Honor. So I agree with you. I think that there was points in after 2019. I think that written motion to release, that is, I mean, boy, I'm building my entire house on that because it was done and I don't think the district court ever properly addressed it. But even if, and I will say for the point of Your Honor's hypothetical, even if some of these later periods there was some acquiescence, the government was in no way prejudiced by this. This isn't a case where we didn't object to a witness on the first day of trial. Government puts on its whole case and then a week later we say, hey, that guy shouldn't have testified. You know, there's obvious prejudice, there's detrimental reliance, et cetera. What we wanted was for Mr. Tucker to be released, physically released. That's still what we want. And the government has been in no way prejudiced by this, no detrimental reliance. So even if there are some later waivers, you know who suffered for that? Chris Tucker. He probably should have been out two or three years ago. Should have been out in 2019. He wasn't, but the waiver in no way hurts the government, so that should not be the basis. We don't know that the government has not been prejudiced by this. I don't know what witnesses are necessary for the individual to be brought to trial, but maybe those witnesses are no longer available, or maybe their memory has faded. And as Judge Heitens points out, a lot of this period of detention was unobjected to by counsel. And finally, is the government really to be defaulted for wanting to bring someone into a position of competency and to make sure that when trial goes forward, the individual is cognizant of the proceedings? I mean, you don't want the government to shove somebody into a trial when they don't know what's going on and they can't assist their attorney. May I answer, Judge Greger? You may. Thank you. Just briefly, to get to your first question, Judge Wilkinson, I do think if, say, this case does somehow ending up going to trial and Christopher Trucker does then try to move to dismiss or say somehow the delay prejudiced him and prejudiced his trial, then I think all the waiver issues come up and the government can say, oh, this prejudiced us at trial too. All we're asking for here is his physical release. It has nothing to do with the merits of his case. So I don't think the waiver affects. And just very briefly to answer your second question, certainly the government does have some interest in doing this, but that's why we have a wholesale hearing. That's why we have a wholesale framework. So certainly the government wants to bring him to trial, has an interest in bringing him to trial, but that's why we're here today. Thank you. Thank you, Mr. Greger. Ms. Nehemiah? Okay, please, the court. Julie Nehemiah for the United States. The facts supported involuntary medication in 2019 and they continue to support involuntary medication today. The vast majority of the delay in this case has been brought about by Mr. Tucker's choices, his choice not to comply with his medication regimen and his choice to assert his right to contest involuntary medication. This court should affirm the decision of the district court, permit the government the opportunity it has been seeking for years to effectively treat Mr. Tucker, restore his competency, and give him the trial that he wants. Counsel, can I ask you, I mean, we are where we are and there's nothing we can do. And I will say this, that as a former government lawyer, you are not responsible for some of the things that I'm about to mention. It seems to me that at least in the early days, these people were really loosey-goosey about these statutory, I mean, there's a question about whether he waived these objections, but I guess I'm troubled that it seems that for the first couple of years, we were really loosey-goosey about the statutory guidelines here. Would you agree with that? I would not agree, Judge Heitens, and this is why. When Mr. Tucker was first admitted to Butner in June of 2018... Oh, no, no, no, I'm talking before Butner. I'm talking about when he's going to Chicago and it takes forever for him to get there. There seemed to be some really loosey-goosey stuff about Butner. During those periods, there were some transportation delays in getting him transported to his evaluations. There was first an evaluation in Chicago, and then following his return from that evaluation... And those are delays that caused us to miss deadlines, it looked to me like? I believe for the first evaluation, BOP received an extension on their reporting deadline from the district courts. I don't know if there was any problem there. But following the first evaluation, it was the defense team, that raised concerns about Mr. Tucker's current condition following his return from Chicago. And that is what prompted the district court, out of an abundance of caution, to undertake a second period of evaluation. And that is when Mr. Tucker went to San Diego, was evaluated a second time, and that resulted in the finding of incompetence at that time, which was then issued in May of 2018. So the finding of incompetency was May of 2018, and that's the beginning of the clock, so to speak, when we look at the government's process of attempting to restore Mr. Tucker, which ultimately was successful in February of 2020. Are you, or the government, I guess, aware of any case where an individual is delayed this long before we decided whether we can even medicate them under SELP? This feels like a really long time. I'm not sure there has been a case in the Fourth Circuit that I'm aware of, Your Honor, but if it would be helpful, Your Honor, there is a case in the Second Circuit, the Megasuba case, which is very parallel to this one. And in that case, the defendant's delay from the finding of incompetency until the eventual SELP order was issued by the district court was 19 months. And in this case, we actually have a time period of just less than 18 months from the finding of incompetency, which was May 2018, until the issuance of the SELP order, which was in October of 2019. And then I guess you'd say that everything that happened since then is a result of the defendant's appealing of that SELP order? Exactly, Your Honor. Once that first SELP order was stayed by the district court, the government was powerless to take further action without Mr. Tucker's compliance. So facing that SELP order on appeal, Mr. Tucker made the decision to begin voluntarily complying with his medication. And so, to answer Your Honor's question from my colleague's presentation, there is very critical facts at JA 1394 and 1395. That's Dr. Grady's report, which details the entire history of his medication levels. And it documents the levels that he was at in the fall of 2019. They changed him to the 25 milligram dose in August of 2019. But then thereafter, Mr. Tucker refused several blood draws. So again, Dr. Grady was operating without exact knowledge of what the medication was doing. And then finally, in January, they increased the dosage to 30 milligrams. So what do we do with Dr. Riley's testimony that he's had 100% compliance since May 2019? That's at JA 304, where Dr. Riley says that. I mean, again, I'll just... He had fairly good compliance. No, no, no. There was testimony that said that he had 100% compliance. Dr. Riley said that. Well, Your Honor, even so, that compliance was at a lower dosage of medication, which ultimately did not prove therapeutic for Mr. Tucker. Because of the lack of blood draws, it was not known at that time that Mr. Tucker was a rapid metabolizer, which was a biological issue where he processed the medication more quickly than perhaps an average patient. And so when that information was obtained, that's when his treatment team went forward with a higher dosage to attempt to attain a therapeutic level in his blood. And that's what brought us to January of 2020, when his dosage was finally increased to 30. The evidence supported that decision. And then in February of 2020, following this period of voluntary compliance, he was restored. The problem is that his levels were not maintained after that date. Counsel, you said he was restored. What do you mean by restored? In the opinion of Dr. Stripling Riley, in February of 2020, he was no longer mentally incompetent. She had observed him. In this case, mentally incompetent, we're talking about schizophrenia with the ideation of delusion, right? So you're saying he's competent once he stops having delusions about conspiracies and the government, because they seem to be contextual to the idea that the government is doing something wrong. So you consider once you have suppressed the ideations of delusions, he's competent? Is that right? Is that the end game for your therapeutic objective? Well, Chief Judge Gregory, the standard for attaining competence is not that there is a complete absence of mental illness. I didn't say the standard. I'm asking what is your objective? Mr. Tucker has to exhibit a factual understanding of the charges and the ability to rationally assist his counsel in his defense. Well, he understands what's going on that he's being charged. I've been there five years. I think he understands that. The question is, are you equating with suppression? If you suppress delusions, then he can help his counsel. Is that right? Is that the theory? I think that's part of it, Chief Judge Gregory. What's the other part? The ability to rationally assist his counsel. And the difficulties that Mr. Tucker encountered were partly caused by his personality disorder. So we have not only psychosis here, but also personality disorder. And when Dr. Stripling-Riley applied that very specific standard in February of 2020, she wasn't saying that he was no longer suffering from personality disorder. She was saying that to the extent that Mr. Tucker exhibits unusual behaviors and communication with his counsel and with others, it's caused by his personality disorder and not by psychosis. And it does not prevent him from rationally assisting in his defense. So with that finding, which was adopted only after she had been treating Mr. Tucker since June of 2018 and observing him for the immediately preceding four months during his third hospitalization period, the district court found that opinion credible. So I get this correct. Once you get his blood levels to the therapeutic level, and therapeutic basically means that based on what the scientists say that at this level, it should work. We don't know it's going to be effective, but the metric is just a therapeutic level, not really results. Once you get it there, then after that, if he tells you, I have not experienced delusions, then he's well enough to go to trial, right? Is that right? Well, yes, Your Honor. If he retained that ability to rationally assist counsel, but that's... No, no, no, no, no. You're determining, helping counsel with delusions that being the barrier. What else do you have? He says personality. A lot of people have personality disorder and they function very well in many high placed jobs, very important jobs. But once he gets to that level, therapeutic level, and he reports no delusions, you equate that with he can help counsel. Is that right? I can't speak to that, Your Honor. Well, you have to speak to that because that's what we're doing. Well, that's the point. We're trained in the law and we're talking about science or dictated. That's why you can't keep people forever and ever and ever. If you get him to therapeutic levels and he says, I had one occasion of delusion. Do you want four more months to get him to zero? The key, Your Honor, is maintaining... Would you answer my question? If you get him to four months of therapeutic levels and he says I only have one instance of delusion, is that enough to say he can go to trial? Because until we get to that, we're just going back and forth with lawyers, counsel,  Is that metric? Is that enough? One instance of delusions after that, is he healed? For purposes of competency? Your Honor, I think if he had maintained a therapeutic level for four months, then yes, he would be restored as long as he maintained the therapeutic level of medication in his blood. I think the opinion of the experts is that that would restore him. And that's what the government is seeking because we haven't had the opportunity to have a four-month period of a therapeutic level to date. We simply weren't able to maintain that therapeutic level because of the very parameters of 4241 because he wasn't hospitalized beyond the end dates of what the statute permitted. So if he were maintained at a therapeutic level, it was the district court's conclusion based on the medical evidence and the recommendations that that would restore him. There was a substantial likelihood as the statute requires, there was a substantial likelihood that he would be restored. Great. I have a couple of questions about the government interest. And I guess I want to start with a factual question that I think I know the answer to, but I just want to confirm. Factually speaking, is it true that at the start of all of this, the government was willing to let him plead guilty and to recommend? I know it would not have been binding on the district court, but the government was going to recommend five years. Is that factually true? No, Your Honor. What the government agreed to was a plea agreement to a single count of transportation of child pornography. This was not an 11C1C plea. No, I know it wouldn't have been binding on the district court, but it was a plea to a single count that carried a statutory range of five to 20 years. This was the case where we went all the way through the plea hearing and at the end of the plea hearing, he said, turns out I don't want to plead guilty. Exactly, Your Honor. Had the government made a sentencing recommendation at that hearing? No, Your Honor. The government was going to recommend a downward departure, though? That is not in the record, Your Honor. Okay. Fair enough. You've now pointed that out, but factually speaking, was the government going to recommend a downward departure? I can't answer that, Your Honor. I'm sorry. I could supplement with a letter later. Why can't you? I don't know, Your Honor. I'm sorry. Well, shouldn't you know? You're here to represent. To my knowledge, there was not a recommendation, but if I find later that I'm wrong, I will advise the court. Okay, so pause it for the sake of argument that's true. We have to obviously get to the bottom that that's true. But pausing for the sake of argument that that were true, why wouldn't that bear pretty heavily against the government interest in restoring this gentleman to competency considering he's now been detained for longer than that? Well, Your Honor, even if that were the case, the government has a significant interest in not only a period of incarceration, but a period of supervised release in this case. There's a significant interest here in obtaining appropriate supervision of Mr. Tucker following his conviction in any period of incarceration. There's a significant concern to have him properly monitored in the community and to have some mechanism by which the government can take further steps if he violates that supervision. So I'm trying to figure out how that cuts, though, because again, there's been a proffer to us, and I don't know if you agree with it or don't, but that basically that BOP has tentatively concluded that he does not meet the standard for involuntary commitment and sort of non-criminal commitment. And you both cite that, and you both say it's good for you. Let me sort of give you the argument why that's not good for you, right? Because if he's not eligible for civil commitment, it's not because he's not mentally ill, because we know he's mentally ill, and it's not because of all... If he's not eligible for civil commitment, the only reason is that the government can't show that he's a present danger to people. And my understanding is that would be the only reason he's not currently eligible for civil commitment. But if you can't show that he's presently dangerous to people, this interest that you're citing about supervised release, I don't have strong values on what that is, because if you could actually show that he's actually a danger to the community, you should be able to get him civilly committed. And the fact that you can't do that suggests that there's not that much danger. So I guess now I'm going through the purposes of punishment. He's already been incapacitated for five years, so to the extent that's one, that's already been fulfilled. If you can't show that he's dangerous to the community because you can't civil commit him, I don't know how protection of the public going forward... I mean, I understand there's retribution, there are other purposes of punishment, but why doesn't that at least weigh against you? The fact that he doesn't meet the criteria for civil commitment. Well, Your Honor, the protection of the public is a much broader idea, as discussed in 3553A, than simply presenting a danger. Sure. The protection of the public from possible future criminal activity is a much broader concept than simply protecting the public from physical danger. Well, Counselor, to follow the logic, unless I misunderstand you, of your argument you just made, if the maximum punishment was five years and we were here seven years later in the same place he is still going around with whether or not we can restore him to competence, you would have the same argument. You would say, oh, I know he could only get five years, he's been here seven years, but we would lose the opportunity to be able to supervise him, to be able to do that. Isn't that correct? Based on the logic of what you just argued? Because you would lose that right. You'd say, well, he's two years beyond the max, but if you don't do something to restore him and try him, then we won't get a chance to have supervised release and all those things. Wouldn't that be the same logic? Well, Your Honor, actually, he faced a statutory range of five to 20. And that's why I gave you a hypothetical where the max is five years, and he's been there seven years. That's why I did that. I understood that, Counselor. I'm saying the logic of what you're arguing would be the same, would it? Would it? You'd be bereft of those arrows in your quiver because you wouldn't have the chance for supervised release. You wouldn't have a chance for conviction. And the second one is that you wouldn't be able to regulate his activities like own a gun, I guess vote, all those other things we take away that you wouldn't have, so you need that, even though he's been there two years over the max. I'm just following the logic of your argument. Is that right? If I understand Your Honor's question, you're asking about a hypothetical case where... No, I'm asking, right, I gave you a hypothetical, a counterfactual, and I'm saying, based on the logic of the argument you just gave, wouldn't that be... Wouldn't your interest still exist, the ones you listed? Would still exist, Your Honor. That's absurd, isn't it? Your Honor, the standard that we have to look at here is whether the government has acted reasonably during the... But you agree that at some point you have to release someone, right? I suspect the government has never met a case where they actually think those standards are... But under the statute, under this entire regime which influenced the Due Process Clause, you have to agree that, in principle, at some point, you have to release someone. Absolutely, Your Honor. Indefinite commitment is not authorized by 42... And as the Chief was saying, in any case, you could make some of these arguments. These arguments... So there has to be a case in which those arguments are overcome by something else, right? You put those two things together, it means that, despite the fact that in every single case you can make these arguments, at some point, those arguments have to be overcome by something else. You agree with that, too? Absolutely, Your Honor. It's a very fact-specific inquiry. The reasonableness of the circumstances in each case is extremely fact-specific. Let me ask... Let me ask... Counselor, let me ask this. I'm worried that we're getting a little bit far afield here, but we have two unpalatable kinds of choices. One is to involuntarily medicate somebody, and nobody likes the whole idea of doing that. The other would be pushing somebody into trial before they're competent to understand the proceedings. And so you've got two very unpalatable courses, and the district court says the way to get out of this is to take what I think is a reasonable shot in restoring this individual to competency. And all the findings here, whether it be the length of the detention or whether it be the reasonableness of the detention, under our Curbo decision, that's subject to a clearly erroneous standard, and under our cell is clearly erroneous standard. And so the district court is charged under our law with negotiating a path between two very unpalatable options, which is continued detention, involuntary medication, trial of someone incompetent. There's just a lot of very difficult roads here, none of which are palatable or desirable. But the law, as I understand it, charges the district court with a way to navigate this thicket and find a way out of this thicket. And the core of it seems to me is that the district court listened to this position, Dr. Gravely, and we did not. And he reviewed the, he found him highly credible and everything, but I don't understand why this wouldn't be a classic case for deference to the district court. It's a maze and it's a thicket in the district court. That's what they exist for, to sort out these sorts of situation where there's a tension between unpalatable choices. Chief Judge, may I respond? I assume you agree with all that, right? Yes, Your Honor. This is why BOP exercised so much caution in exhausting all other avenues of voluntary compliance of treatment until it finally made the recommendation and until the district court examined those cell factors and came to the finding that there simply was no other alternative. The government is only asking for one bite at the apple, an effective treatment. Excuse me, Judge Wilkerson. You said the government is only asking for one bite at the apple? My goodness, you got the core in this tree almost. Sir, we're talking about effective treatment and that has been what has been so elusive in this case. If we can reach an effective treatment, we believe Mr. Tucker will be restored. Go ahead, Judge. I was going to go to different topics. Judge Wilkerson, you're on the same topic. Go ahead. I just wanted to ask whether the government's earlier plea offer is still on the table, the single count with the five to 20 year age. Is that still on the table? Your Honor, I don't believe I can answer that question. I don't believe those have been, those options have been discussed recently. All right, well, is that option going to be put forward to this individual? I believe the government would always be open to reaching an agreement. All right, now, if that's the case, would this individual get credit for time served, the time in detention? Absolutely. Absolutely, Your Honor. Okay, so if the, if you're not ruling out the possibility that the government's original plea offer would be on the table, Judge Heitens has talked about whether the government was prepared to make a sentencing recommendation and perhaps the way out of this is to renew that plea offer to have something in the way of a sentencing recommendation put before this individual to take it or leave it with the understanding that the time spent in decision, in detention would be credited to this individual. It may be that, I mean, we've got a terribly thorny situation, but I think maybe the government has a way to break the log jam by renewing its plea offer for having something concrete in the way of a sentencing recommendation and granting credit for time served. Is that a way to unlock this very difficult case? If I may, Your Honor, the government will definitely consider that, but of course that's all contingent upon Mr. Tucker being competent to enter a plea. So the questions I had were about a different topic, which is this, you mentioned the district court very carefully went through it and the district court's opinion is very thorough. I guess one thing I didn't see, and this is about the length of detention issue. So the district court basically says, why is this the first time I'm hearing about this? Why is the first time I'm hearing about it? The one time he seemed to very unambiguously say, you're holding me too long was in August, 2019, where he literally said, you're holding me too long. And I didn't see the district court address that. So you read the district court's opinion, it's very persuasive. Like we've been here the whole time. Why in the world have you literally never said you're holding me too long? And that's really persuasive on its face. But then I think about, did the district court actually say anything about August 12th, 2019, where Mr. Tucker very, very clearly said, you're holding me too long, you need to let me go. What do I do with that? Your Honor, I believe, and I can check and report with further detail later, but I believe the district court considered that argument, but the argument was not raised in the context of a 42-41 violation. It was simply being raised in the sense of Mr. Tucker wanting to be on pretrial release. And so to that, that argument was later considered actually in 2020, when he filed a motion for release and the district court found that the standard for release had not been met under the Bail Reform Act. And then I just, I guess the last question, your friend on the other side says, and I want to give you a chance to respond, like, which is to say, I mean, it's dealing with people who are legally incompetent is really difficult because they're legally incompetent. So your friend on the other side says, he does object. He objects in 2019. He objects these few other ways. And yes, there are later times that he doesn't object, but one of the things about being legally incompetent is that you're legally incompetent. And there's a certain perversity of saying that because you're legally incompetent and weren't able to protect your interest, you've now forfeited the ability to protect your interest. What do you respond to that with? Well, your Honor, in the Curbo decision, this court did clarify that even a mentally incompetent defendant represented by counsel can be held to have waived any objection to a period of detention. And so we would submit that applies here. Thank you. All right. Are there any further questions? We submit. Thank you, Ms. Niemeyer. Your Honor, I want to get Judge Heightens right to what you just ended with. Joint Appendix 499, this is the first cell order by the district court. Footnote one, he says, you know, this was in September, so a month after the motion was filed, Tucker's counsel stated that he had a pending motion to deny the government an additional 120-day observation period. And then he says the court can't find this motion. But I mean, it was on the docket. And the court says, but you know, to me, this all gets rolled up in the cell thing. So I do think his legal analysis of that, you're right, never happened because he never saw the motion for what it was, which was based on the statutory limits of 4241D. I also want to get, you mentioned the very first arraignment of the Rule 11, Judge Heightens, and this gets to your point, Judge Wilkinson, couldn't we just get him to take a plea to time served and we all go home, we're all happy. We have been trying to do this to Mr. Tucker for five years now, since 2017. I mean, if you look at that docket, the information's filed, the plea agreement's filed the next day, the Rule 11, he was being pushed through the system. You have this whole Rule 11 hearing. We've all been there a hundred times, very formal, very this. Well, Mr. Brignard, from your point of view, what is the impediment to what I have suggested, which is that there be a renewal of the plea offer, an offer of a sentencing recommendation, and some sort of credit for time served. It wouldn't necessarily be an immediate release there, but it would resolve the problem of this indefinite detention for whatever reason, noncompliance, or you haven't raised it, or a waiver. It's still not a happy kind of thing. But why wouldn't this go a long way to compromising the various interests involved? Because otherwise, you're left with a very difficult situation, I think, which is we've got two critical findings, both of which are subject to a clearly erroneous standard of review. Curbo makes clear that reasonableness of detention is subject to a clearly erroneous standard. Sell makes clear that substantially likely is subject to a clearly erroneous standard. So I think you've got a hurdle there, but at the same time, I understand the equities of your situation, which is that this is a very long period of detention, and that's an uncomfortable situation. And I want to know, what is the impediment to having the plea offer renewed, a sentencing recommendation proffered, and credit to this individual for time served? Why haven't the parties come to the table on something like that? What is the problem? What is the resistance? Two answers, Your Honor, and I cannot put it any better than my client did. Joint Appendix 36, line 11, I'm actually going to plead not guilty. And maybe I'm reading too much into that word, actually, but I think that was the first time the system actually asked Mr. Tucker what he thought. He was going to be pushed through, oh, got a good plea, you're five years, boom, let's go. Secondly, Your Honor, so first, he's not guilty. I'm actually not guilty. Let's ask Mr. Tucker, he's actually not guilty. I don't think if he were made competent, he'd take the plea. Secondly, Your Honor, he has to be made competent. He has to be shot up with drugs in order to effectuate your solution. I want to just say really quickly, Joint Appendix 304, 100% compliance, Joint Appendix 1392, 1393, the dissolvable pill, the government pointed out that he didn't take blood draws then, there are issues with blood draws, and that was when he was on the dissolvable medication. And the one blood draw he took indicated that the drugs were at a therapeutic level. And he's still talking about the prison law library being hacked. It gets to your point about the delusions, Judge Gregory. My light's on. I'm happy to take any other questions. Otherwise, we would ask you to order Mr. Tucker released. And whichever way this panel comes out, I would very respectfully request that it do whatever it's going to do as quickly as possible. I think the government and I both agree, and certainly Mr. Tucker agrees, this does need to resolve one way or another, so we would obviously ask for the relief we want, but whatever relief happens as soon as practical. Thank you very much. That's just one question in terms of, again, I like your point, like somebody said, finally they asked the person involved, Mr. Tucker, what he thinks. Let me ask you this in terms of, and I'm not obviously for you to go into any kind of confidentiality with your client, but do you really believe, first of all, do you understand, is your understanding that these medications, these medications are suppressive medications? They suppress, it's generally given, but they think it's just going to go like in the brain. Okay, let's go right to the delusional part of the brain, and let's suppress. It suppresses a broader base of that, right? My understanding is it suppresses symptoms beyond the delusions, and actually is not as helpful, in his case, with the delusions. As a matter of fact, science says the best way is psychotherapy, really, than the pharmaceutical response. That's why I don't understand why we never talk about the science. We come here to talk about that, but psychotherapy is probably the best because a lot of people don't medicate in those situations because they don't like the way it makes them feel. Dull effect, lethargy, all those kind of things. It can lead to a lot of things. Such a poor point is, okay, I don't have delusions anymore, but I'm depressed. Libido, all of those things like that, and so you think as counsel that this is going to be like, once he gets to that level, no delusions, he can help you, and again, I don't want you to, that's, I'm just, do you think so? Do you think that's, because I think you were part of the, I mean the counsel, right, decided the whole idea of saying these delusions, there's no question he does have this problem, schizophrenia, but do you think that's going to help? I think, Your Honor, that if the delusions, I think the delusions have never gone away. He's always talking about the FBI, etc. I do think that if the delusions had gone away, that seems to be what is impairing him from assisting counsel. Now certainly, if the delusions go away, and it turns out that, you know, we sort of pull away this mental illness, and then there's some deeper pathology inside, I certainly wouldn't say, but I do think Your Honor is right to focus on the delusions, and particularly on the inability to assist counsel. I think Mr. Tucker, throughout these proceedings, and in fact, the very, very first motion to determining competency didn't allege that he didn't know what was going on. He understood what he was charged with. He understood the penalties. He knows what a judge is. He knows what a prosecutor is. But when you're talking about the prison law library being hacked and the FBI planning evidence, and it's just impossible, like, and I don't want to bring too much of my own experience in here, but you can't help a client like that, and a client can't help himself. And under Duffy and under 4241D, that's required. Due process requires that. Yeah. I think the problem in this case is you'll never be able to get away from the contextual aspect of the delusions because it's the context on steroids. It's the government now, actively, no conspiracy theory, trying to put him in prison. I don't mean that in a negative sense because that's your job, but you're trying to give him many, many years in prison, so it'll always feed into his delusion, which is that the government is after me. So in a sense, it's like telling somebody who's manic-depressant, cheer up. They can't cheer up because they're manic-depressant. So how are you going to get somebody with delusions that are based solely in the context of the government and you're trying to get, like, you had a great point. In order to get him to the point that Judge Wilkinson raised, which I think is a good point about can we work this out, you have to get him to the point where he can thank counsel. Nehemiah said the same thing. We have to get him to the point where he's competent to even accept the plea. But you see what I'm saying? So you're still in this, I got to depend on that government to do what? So you never get away from the context of his delusion. So I'm just wondering in terms of Mr. Tucker being the center of our centering moment here for trying to get justice in this case, how do you deal with this? And I think to the credit of the government doctors and the Butner doctors, throughout their reports, they've mentioned how they can't really talk to him about the charges because that gets to, he's a represented party and obviously Fifth Amendment issues and all of that. So the very sort of possible talk therapy that could help, if his delusions weren't about his case, if his delusions were his dead grandfather was talking to him or something, then possibly they could have that. But I think, and again, to their credit, they understand they can't. So that sort of means they can't, even if as Dr. Hilke indicated, years of psychotherapy could possibly get him cured. It's not psychotherapy that the Bureau of Prisons, the United States government could give. Right. They could never be the recipients, I mean, the giver, because that, yeah. Okay, that's all I have. Judge Wilkinson, anything further? I have no further questions. All right. Thank you very much, Your Honor. Thank you so much, counsel. We appreciate your arguments. It's a very difficult case and we wish you well and stay safe. Take care. We'll move on to our next case.
judges: Roger L. Gregory, J. Harvie Wilkinson III, Toby J. Heytens